UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

| | |
|---|---|
| SHAHIDAH LOUIS, )<br> )<br>        Plaintiff, )<br> )<br>v. )<br> )<br>COMMISSIONER OF )<br>SOCIAL SECURITY, )<br> )<br>        Defendant. )<br>_____) | Case No. 1:10-cv-973<br><br>Honorable Janet T. Neff<br><br><br>**REPORT AND RECOMMENDATION** |

This is a social security action brought under 42 U.S.C. § 1383(c)(3) seeking review of a final decision of the Commissioner of Social Security denying plaintiff's claim for supplemental security income (SSI) benefits. On November 10, 2005, plaintiff filed her application for benefits alleging a March 5, 1998 onset of disability.[1] (A.R. 74-76). Her claim for SSI benefits was denied on initial review. (A.R. 59-62). On April 14, 2008, she received a hearing before an administrative law judge (ALJ), at which she was represented by counsel. (A.R. 533-69). On September 23, 2008, the ALJ issued a decision finding that plaintiff was not disabled. (A.R. 16-23). On August 2, 2010,

---

[1]This was plaintiff's fifth application for SSI benefits. (A.R. 77-78). The ALJ's decision not to reopen her earlier claims for SSI benefits is not subject to judicial review. *See Califano v. Sanders*, 430 U.S. 99, 107-08 (1977).
    SSI benefits are not awarded retroactively for months prior to the application for benefits. 20 C.F.R. § 416.335; *see Kelley v. Commissioner*, 566 F.3d 347, 349 n.5 (3d Cir. 2009); *see also Newsom v. Social Security Admin.*, 100 F. App'x 502, 504 (6th Cir. 2004). The earliest month in which SSI benefits are payable is the month after the application for SSI benefits is filed. Thus, December 2005 is plaintiff's earliest possible entitlement to SSI benefits.

the Appeals Council denied review (A.R. 5-7), and the ALJ's decision became the Commissioner's final decision.

On October 4, 2010, plaintiff filed her complaint seeking judicial review of the Commissioner's decision denying her claim for SSI benefits. Plaintiff argues that the ALJ "committed reversible by denying Plaintiff's claim based on the fact that she had engaged in constitutionally protected activity." (Plf. Brief at 12, docket # 11). Upon review, I recommend that the Commissioner's decision be affirmed.

## **Standard of Review**

When reviewing the grant or denial of social security benefits, this court is to determine whether the Commissioner's findings are supported by substantial evidence and whether the Commissioner correctly applied the law. *See Elam ex rel. Golay v. Commissioner*, 348 F.3d 124, 125 (6th Cir. 2003); *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001). Substantial evidence is defined as "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Heston v. Commissioner*, 245 F.3d 528, 534 (6th Cir. 2001) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *see Rogers v. Commissioner*, 486 F.3d 234, 241 (6th Cir. 2007). The scope of the court's review is limited. *Buxton*, 246 F.3d at 772. The court does not review the evidence *de novo*, resolve conflicts in evidence, or make credibility determinations. *See Walters v. Commissioner*, 127 F.3d 525, 528 (6th Cir. 1997). "The findings of the [Commissioner] as to any fact if supported by substantial evidence shall be conclusive . . . ." 42 U.S.C. § 405(g); *see McClanahan v. Commissioner*, 474 F.3d 830, 833 (6th Cir. 2006). "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial

evidence to support a different conclusion. . . . This is so because there is a 'zone of choice' within which the Commissioner can act without fear of court interference." *Buxton*, 246 F.3d at 772-73. "If supported by substantial evidence, the [Commissioner's] determination must stand regardless of whether the reviewing court would resolve the issues of fact in dispute differently." *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993); *see Smith v. Chater*, 99 F.3d 780, 782 (6th Cir. 1996) ("[E]ven if the district court -- had it been in the position of the ALJ -- would have decided the matter differently than the ALJ did, and even if substantial evidence also would have supported a finding other than the one the ALJ made, the district court erred in reversing the ALJ."). "[T]he Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Commissioner*, 336 F.3d 469, 477 (6th Cir. 2003); *see Warner v. Commissioner*, 375 F.3d 387, 390 (6th Cir. 2004).

## **Discussion**

The ALJ found that plaintiff had not engaged in substantial gainful activity on or after November 10, 2005. (A.R. 18). Plaintiff had the following severe impairments: "status post [1998] fracture of right femur, healed with leg length difference, depression, and back pain." (A.R. 18). Plaintiff did not have an impairment or combination of impairments which met or equaled the requirements of the listing of impairments. (A.R. 19). The ALJ found that plaintiff retained the residual functional capacity (RFC) for a limited range of light work:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. 416.967(b) that involves lifting and/or carrying 20 pounds occasionally and 10 pounds frequently; standing and walking 6 hours of an 8-hour workday; sitting 6 hours of an 8-hour workday; pushing

> and pulling limited in the lower extremities; only occasional climbing of ramps, stairs, ladders, ropes, scaffolds; balancing, stooping, kneeling, crouching or crawling; and, use of a cane for safety and to prevent falls.  Her mental impairments cause only mild limitations in maintaining activities of daily living, social functioning, and concentration, persistence or pace.

(A.R. 20).  The ALJ found that plaintiff's testimony regarding her subjective functional limitations was not fully credible:

> A review of the medical and other evidence shows the claimant has a history of a healed fracture of the right femur with rod placement and leg length difference.  She uses a cane not so much for walking but at least for safety.  She has received intermittent physical therapy, and testified that she was given a lift for her shoe which she wore, but it made her [sic] with pain in her calf, so that she went back to the first lift that went in the heel.  However, she was not wearing the lift at the hearing.  The undersigned recognizes that notations of episodic wearing of orthotics have been described in the record and that the claimant has ultimately not completely complied with wearing it.  Therefore, it is understandable that she will continue to develop problems with her back.
>
> The claimant submitted a list of medications which indicates she takes Vicodin for pain, Flexeril for spasms and Cymbalta for depression (Exhibit B-19E).
>
> The record shows that the claimant's boyfriend was shot two months after she had his baby and she was experiencing depression and anxiety.  At a consultative [examination], she alleged hallucinations, but when the psychologist inquired further, the claimant had no prior objective or subjective medical evidence that would support these issues.  She had some signs of depression, but was functional.  She was oriented times three and her memory was fair as was information, calculations, and judgment.  Nevertheless the psychologist gave her a GAF of 41, which is consistent with major difficulties in making social and occupational adjustments (Exhibit B-17F).
>
> While the undersigned is aware that the claimant may be experiencing right lower extremity pain with some loss of full functioning, difficulties with depression and mental health issues together with pain in her leg and back, she does not follow wearing of prescribed orthotic and does not follow through with prescribed physical therapy modalities.  In addition, there is no continual mental health treatment.  It appears episodic and coincidental to application dates.  The record does not support consistent treatment on those impairments from which she reports the most difficulties.  Further, while she alleges help taking care of her four children, she is capable of becoming pregnant, carrying children to full term, providing the majority of her own care and that of her children.

> Thus, after a review of the medical and other evidence, the undersigned finds that the claimant's severe impairments could reasonably be expected to produce the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the residual functional capacity assessment for the reasons explained above (SSR 96-7p).
>
> The undersigned has considered the opinions of the State Agency physicians who reviewed the case and agrees with the ultimate conclusion reached with respect to the issue of disability (SSR 96-6p).
>
> The objective medical findings, subjective allegations, medical opinions, and other relevant evidence support a finding that the claimant is able to perform the work activities as described in the residual functional capacity.

(A.R. 20-21). Plaintiff has no past relevant work. (A.R. 21). Plaintiff was 25-years-old when she filed her application for benefits. Thus, at all times relevant to her claim for SSI benefits, plaintiff was classified as a younger individual. (A.R. 21). Plaintiff has at least a high school education and is able to communicate in English. (A.R. 21). The transferability of job skills was not an issue because plaintiff did not have past relevant work. (A.R. 21). The ALJ then turned to the testimony of a vocational expert (VE). In response to a hypothetical question regarding a person of plaintiff's age, and with her RFC, education, and work experience, the VE testified that there were approximately 17,000 jobs in the State of Michigan that the hypothetical person would be capable of performing. (A.R. 559-64). The ALJ found that this constituted a significant number of jobs. Using Rule 202.20 of the Medical-Vocational Guidelines as a framework, the ALJ held that plaintiff was not disabled. (A.R. 22-23).

**1.**

Plaintiff argues that the ALJ "committed reversible error by denying [her] claim based on the fact that she had engaged in [the] constitutionally protected activity" of having children. Her three-paragraph argument is more readily quoted than summarized:

> In this case, Plaintiff has shown herself to be less than fully cooperative with physical therapy, and she clearly has not always pursued a wise lifestyle. Certainly, reasonable persons could disagree with some of the ways that she has conducted her life. Nevertheless, under the United States Constitution and under current federal law, all persons, regardless of how likeable they are, are entitled to the same standard of justice. To be more specific, all citizens are entitled to both substantive and procedural due process when they appear before courts and agencies of the United States of America. Unfortunately, that is exactly what plaintiff did not receive.
>
> More specifically, the ALJ, as quoted above, denied Plaintiff's claim for benefits at least in part because "she is capable of becoming pregnant, carrying children to full term, and providing the majority of her own care and that of her children" (21). At this point, Plaintiff should note at the time of her hearing, while she had a young child, she was currently not pregnant; at the time of her hearing, she had four children, the youngest of which was two (539). More importantly, ever since the right of privacy was first mentioned in the dissent in Poe v Ullman, 367 U.S. 497, 522 (1961)(Harlan J., dissenting), numerous decisions since then have established the rights of all persons to use contraceptives in Griswold v Connecticut, 381 U.S. 479 (1965), and in Eisenstadt v Baird, 405 U.S. 438 (1972). Of course, that means that there is also a right not to use contraceptives and to have children. The Supreme Court's decision in Carey v Population Services International, 431 U.S. 678, 687 (1977), clearly stated that an individual has a right to make decisions as to whether to procreate free from unwarranted governmental intrusion. Plaintiff would note that while Carey did not have a clear majority opinion, that it does appear that a majority of the Supreme Court did subscribe to the above principle.
>
> Clearly, Plaintiff cannot be denied benefits because she was engaged in constitutionally protected activities, and the fact that Plaintiff has chosen to reproduce does not in any way raise an issue of credibility on her part in this case. For this ALJ to make the statement that he did in his Decision is simply intolerable in any real system of justice. While there certainly is some evidence that there were jobs that Plaintiff could perform, there is simply no place in the American system of justice for a decision which obviously relies on improper criteria. This Court would not affirm a decision which stated that it did not award benefits based even in part upon the race, sex or ethnicity of the plaintiff, and rightly so, because the use of such criteria is completely contrary to all Constitutional principles. Likewise, this Court should not allow a decision which denies a claim based upon that plaintiff's assertion

and use of her constitutional rights. As a result, the ALJ's Decision would appear to be not only a clear violation of Plaintiff's constitutional rights, but also a clear violation of due process that should entitle Plaintiff to a new hearing before a different ALJ.

(Plf. Brief at 12-13, docket # 11). Upon review, I find no violation of plaintiff's constitutional rights.

Without question, the Supreme Court cases cited by plaintiff define a right of constitutionally protected privacy, and the decision whether or not to bear children certainly falls within this protected sphere. *See, e.g., Carey v. Population Servs., Int'l*, 431 U.S. 678, 684-85 (1977) ("Although the Constitution does not explicitly mention any right of privacy, the Court has recognized that one aspect of the liberty protected by the Due Process Clause of the Fourteenth Amendment is a right of personal privacy, or a guarantee of certain zones of privacy. . . . The decision whether or not to beget a child is at the heart of this cluster of constitutionally protected choices."). And, had the ALJ denied benefits because of plaintiff's choice to procreate, she could well have an argument. But that was not what the ALJ decided. The ALJ did not deny plaintiff's claim for SSI benefits based on her decision to become pregnant. The ALJ denied plaintiff's claim because the evidence showed that she was not disabled. Read in context, the ALJ's finding concerning plaintiff's ability to bear and care for children related to her physical condition and ability to execute the ordinary activities of daily life.[2] Certainly, if plaintiff's physical condition rendered her too weak to bear or care for children, she would be justified in presenting such facts in support of her claim. The consideration of such evidence, whether favorable or unfavorable, in assessing a claimant's ability to work is unobjectionable. *See* 20 C.F.R. § 416.929(a); *Warner v. Commissioner*,

---

[2] The ALJ's findings were taken nearly verbatim from the report of Dr. John Pai, a consultative psychiatrist. *See* A.R. 398.

375 F.3d at 392; *Walters v. Commissioner*, 127 F.3d at 532; *see also Monateri v. Commissioner*, 436 F. App'x 434, 445-46 (6th Cir. 2011).

Plaintiff's brief reads a single sentence of the ALJ's opinion totally devoid of context, blows it completely out of proportion, ascribes sinister motives without any basis, and then attempts to concoct a constitutional violation. Plaintiff's argument is devoid of merit.

**2.**

Plaintiff disagrees with the ALJ's factual finding regarding her credibility. (Plf. Brief at 12; Reply Brief at 1-2). It is the ALJ's function to determine the credibility of the witnesses. *See Siterlet v. Secretary of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Credibility determinations concerning a claimant's subjective complaints are peculiarly within the province of the ALJ. *See Gooch v. Secretary of Health & Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987). "An ALJ is in the best position to observe witnesses' demeanor and to make an appropriate evaluation of their credibility. Therefore an ALJ's credibility assessment will not be disturbed absent compelling reason." *Reynolds v. Commissioner*, 424 F. App'x 411, 417 (6th Cir. 2011) (citation omitted); *see Norris v. Commissioner*, No. 11-5424, 2012 WL 372986, at * 5 (6th Cir. Feb. 7, 2012)("Because a reasonable mind might accept the evidence as adequate to support an adverse-credibility determination, we conclude that substantial evidence supports the ALJ's finding."). The court does not make its own credibility determinations. *See Walters v. Commissioner*, 127 F.3d at 528. The court cannot substitute its own credibility determination for the ALJ's. The court's "review of a decision of the Commissioner of Social Security, made through an administrative law judge, is extremely circumscribed . . . ." *Kuhn v. Commissioner*, 124 F. App'x 943, 945 (6th Cir.

2005). The Commissioner's determination regarding the credibility of a claimant's subjective complaints is reviewed under the deferential "substantial evidence" standard. "Claimants challenging the ALJ's credibility determination face an uphill battle." *Daniels v. Commissioner*, 152 F. App'x 485, 488 (6th Cir. 2005). "Upon review, [the court must] accord to the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which [the court] d[oes] not, of observing a witness's demeanor while testifying." *Jones*, 336 F.3d at 476. "The ALJ's findings as to a claimant's credibility are entitled to deference, because of the ALJ's unique opportunity to observe the claimant and judge her subjective complaints." *Buxton v. Halter*, 246 F.3d at 773. "Since the ALJ has the opportunity to observe the demeanor of the witness, his conclusions with respect to credibility should not be discarded lightly and should be accorded deference." *Casey v. Secretary of Health & Human Servs.*, 987 F.2d 1230, 1234 (6th Cir. 1993); *see White v. Commissioner*, 572 F.3d 272, 287 (6th Cir. 2009).

The medical evidence shows that plaintiff injured her right femur in a March 1998 car accident. Susan Day, M.D., surgically repaired plaintiff's broken leg with an intramedullary rod. (A.R. 444-46). On July 7, 1998, Dr. Day reported: "this has gone on to heal quite nicely." (A.R. 449).

On November 24, 2002, plaintiff appeared at Spectrum Health accompanied by her mother. Plaintiff had a tooth extracted, and there was a concern that she may have taken too much Tylenol. Plaintiff was not depressed and she had no suicidal ideation. She was treated and released. (A.R. 292-90).

On September 25, 2002, plaintiff was examined by doctors at Metropolitan Hospital. She was described as a "22-year-old [] restrained driver involved in a motor vehicle accident at a low

rate of speed. The patient was driving through the parking lot when she was struck on the passenger's door." (A.R. 251). Plaintiff complained of some neck pain, headache, and mild nausea. She was treated and released. (A.R. 251-52).

March 10, 2003 x-rays of plaintiff's right leg showed a healed fracture. There was "no sign of osteomyelitis or recurrent fracturing." (A.R. 277). Plaintiff's June 9, 2003 ultrasound showed an intrauterine pregnancy with gestational age of approximately six weeks. (A.R. 276).

On February 10, 2004, plaintiff received a consultative mental status examination. Plaintiff reported that she had graduated from high school. She stated that she provided occasional daycare for the children of friends and relatives. She related that she had three children of her own, "ages one, two, and three weeks." (A.R. 305). She lived in a townhouse with her three children. (A.R. 305). Her daily activities centered around providing care for her children. (A.R. 306). Plaintiff was oriented in all three spheres. Her thought processes were logical and organized. Her speech was clear and understandable. Plaintiff's memory and concentration were grossly intact. She did not display delusional thinking. The examiner offered a diagnosis of a "Mood Disorder due to chronic pain with depressed mood – moderate" and gave plaintiff a Global Assessment of Functioning (GAF) score[3] of 52. (A.R. 308).

---

[3]GAF scores are not entitled to any particular weight. *See Kornecky v. Commissioner*, 167 F. App'x 496, 511 (6th Cir. 2006). "GAF examinations measure psychological, social, and occupational functioning on a continuum of mental-health status from 0 to 100, with lower scores indicating more severe mental limitations." *White v. Commissioner*, 572 F.3d 272, 276 (6th Cir. 2009). A GAF score is a subjective rather than an objective assessment. *Id*. "GAF is a clinician's subjective rating of an individual's overall psychological functioning. A GAF score may help an ALJ assess mental RFC, but it is not raw medical data. Rather, it allows a mental health professional to turn medical signs and symptoms into a general assessment, understandable by a lay person, of an individual's mental functioning." *Kennedy v. Astrue*, 247 F. App'x 761, 766 (6th Cir. 2007); *see Kornecky*, 167 F. App'x at 503 n.7. The DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS' (DSM-IV's) explanation of GAF scale indicates that "a score may have little or no

On February 18, 2004, R. Scott. Lazarra, M.D., conducted a consultative examination. Plaintiff reported that she could not lift anything heavier than her one-year-old son. (A.R. 298). Plaintiff's days "primarily consist[ed] of raising her children." (A.R. 298). Her motor strength was normal and her reflexes were 2+ and symmetrical. Her leg-length discrepancy caused her to walk with a moderate right limp without an assistive device. Dr. Lazarra recommended that plaintiff consider the use of a right foot orthotic to address her "right/left leg discrepancy of approximately ½ inch." (A.R. 301).

On February 18, 2004, plaintiff met with her treating physician Edwin T. Kornoelje, D.O., for a "recheck" of her back pain. Plaintiff had some scoliosis. Her straight leg raising tests were negative. Dr. Kornoelje noted that because plaintiff was not pregnant, there were additional options available for treating her back discomfort. Dr. Kornoelje referred plaintiff to Dr. Theut. (A.R. 356). Plaintiff did not appear for her appointment with Dr. Theut. (A.R. 355). Plaintiff's September 2, 2004 nerve conduction tests returned normal results. (A.R. 354, 358-61).

On February 23, 2005, plaintiff advised Dr. Kornoelje that she had lost the lift for her right shoe. He provided her with a new lift. Plaintiff reported that her back pain was worse. Dr. Kornoelje noted: "She always has this problem when she is pregnant." (A.R. 352). On March 16, 2005, plaintiff "was 5 months pregnant" and stated that she was experiencing some neck pain. Dr. Kornoelje found that plaintiff's neck had a good range of motion. He gave plaintiff a prescription for Flexeril. (A.R. 351). On July 17, 2005, plaintiff gave birth to her fourth child. On September

---

bearing on the subject's social and occupational functioning." *Kornecky*, 167 F. App'x at 511; *see Oliver v. Commissioner*, 415 F. App'x 681, 684 (6th Cir. 2011).

19, 2005, plaintiff reported in a postnatal depression interview that her boyfriend had been shot. (A.R. 338).

On November 4, 2005, plaintiff was examined by Erik C. Hedlund, D.O. (A.R. 364). X-rays revealed that plaintiff's right leg fracture was "well healed" and there was no evidence of hardware failure. Dr. Hedlund stated that plaintiff's low back pain was probably caused by her leg-length discrepancy. He referred plaintiff to a podiatrist. (A.R. 365).

On November 10, 2005, plaintiff filed her application for SSI benefits. On November 15, 2005, John F. Harris, D.P.M., examined plaintiff. He described plaintiff as a "well-developed, well-nourished, 25 year-old female" in "no apparent distress." (A.R. 362). Podiatrist Harris fashioned a new 1.5 cm lift for plaintiff to wear in her right shoe. (A.R. 363).

On February 21, 2006, State Agency physician Dan Graham reviewed plaintiff's medical records and offered his opinion that plaintiff was capable of performing light work. (A.R. 370-77). Dr. Graham noted that plaintiff was 25-years-old and had "carried four children to full term births since 3/98. The first child being born in 2001 and the last in 2005." (A.R. 375). The medical evidence of record showed that plaintiff's right leg was "about 1 ½ to 2 cm. shorter than her left leg." (A.R. 375). Plaintiff had "mild" chronic pain, a slight limp, and used a cane at times "for long distance ambulation." (A.R. 375). "Her allegations of using a walker and a cane to ambulate and complete inability to work by virtue of applying for disability [were] not consistent with the evidence in the file." (A.R. 375).

On February 27, 2006, plaintiff received a consultative mental status examination conducted by Robert Baird, a limited license psychologist. (A.R. 378-83). Plaintiff stated that she had no history of psychiatric hospitalization. She had been diagnosed with depression following her

-12-

1998 car accident. Plaintiff had not participated in any counseling services "since 1999 or 2000." (A.R. 379). She reported that she had been "married once for two years and the divorce was finalized in 2004" and that she had "four children, ages 5, 3, 2 and 7 months." (A.R. 379). Plaintiff's intellect appeared normal. She was oriented in all three spheres. (A.R. 380-81). Plaintiff stated that she drank alcohol "'now and then' which she quantifie[d] as drinking one half pint of vodka on Saturdays." (A.R. 379). Plaintiff stated that she experienced "weekly" suicidal thoughts. She reported that she experienced hallucinations:

> Hallucinations and delusions were explored with this claimant. She comments, "I've seen demons. One tried to kill me. It was choking me." "About a month ago, I was sleeping and I felt something come on me. I saw a black shadow," believing that it was her ex-husband, she said, "If you're going to kill me, do it. I'm ready to die." "It started choking me." She reports that this has occurred "a lot of times" every few weeks.

(A.R. 381). Psychologist Baird offered a diagnosis of "Major depression, severe with psychotic features" and gave plaintiff a GAF score of 41. (A.R. 382).

On March 20, 2006, Psychiatrist John Pai, M.D., reviewed plaintiff's records and came to a significantly different conclusion than Baird. (A.R. 386-99). Dr. Pai found that plaintiff's depression resulted in mild restriction in activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in concentration, persistence or pace. (A.R. 396-97). Plaintiff was generally independent in her activities of daily living, but required some assistance in providing care for her children:

> 2/24/06 ADLs; The clmt lives with her four children (5, 3, 2 & 7 months). She alleges some help in taking care of her children from family members. The evidence in file does not support that this help is of a constant nature. The clmt is capable of becoming pregnant, carrying four children to full term, and providing the majority of her own care and those [sic] of her children (she [has been living] in her own apartment with her four children for the past three years). The clmt's primary problem appears to be RLE pain with some loss of physical functioning.

(A.R. 398).

On May 16, 2006, plaintiff returned to Dr. Kornoelje. She reported that she had lost the prescription provided by her podiatrist and "did not get the lift in the shoe that was suggested." (A.R. 401). Plaintiff retained good strength in her upper extremities. Her cervical spine x-rays "look[ed] excellent." (A.R. 401). Dr. Kornoelje referred plaintiff to a podiatrist and started her on a course of physical therapy. (A.R. 401).

On May 22, 2006, plaintiff reported symptoms of depression, stress and grief to her obstetrician/gynecologist, Dorsey Ligon, M.D. Dr. Ligon gave plaintiff a prescription for Cymbalta. (A.R. 468).

In June 2006, plaintiff asked a social worker at Arbor Circle for "support services from [a] clinician and case manager to help aid her in finding summer activities for the children, stress management ideas, household management, and overcoming grief issues due to her cousin's recent death." (A.R. 509). Plaintiff reported that her social interaction included dating the father of her 10-month-old child. (A.R. 510-11). "No concerns" were noted regarding plaintiff's emotional, mental, or behavioral health. (A.R. 510). Plaintiff took advantage of Arbor Circle's "Infant/Toddler" program, but was terminated as a client on September 6, 2006, because she failed to appear for her scheduled appointments. (A.R. 514-16).

On June 27, 2006, Dr. Kornoelje scheduled plaintiff for a course of physical therapy to address her complaints of right knee pain. (A.R. 403). Plaintiff was discharged from physical therapy on July 6, 2006, because she failed to appear for her appointments. (A.R. 522-23). On July 14, 2006, Dr. Kornoelje wrote:

> CHIEF COMPLAINT: Shahidah presents to the office today of a recheck of her right knee. She was actually scheduled for physical therapy for this but missed her appointment. Over the weekend she twisted it and now the pain is worse again. She thinks she tore a ligament a couple of years ago and it feels the same way. She has an immobilizer on and she is otherwise doing okay. She has difficulty with her 4 kids at home, taking care of them and lifting them and moving them around. She actually cannot lift them well at all.

(A.R. 404). The July 27, 2006 MRI of plaintiff's right knee returned normal results. (A.R. 405).

On August 29, 2006, Dr. Ligon described plaintiff as physically and psychiatrically "normal." Dr. Ligon prescribed Prozac in response to plaintiff's complaints of depression. (A.R. 470).

On September 1, 2006, plaintiff returned to Dr. Hedlund with complaints of knee pain. He observed that plaintiff "continue[d] to have vague leg symptoms with history of 2 normal MRIs and a normal lumbar spine MRI. I do feel she would benefit from the inserts as previously recommended, however, she only attempted using a lift for one week. I informed the patient that she will have some associated discomfort, however, she needs to give the inserts an adequate trial and see if they would be of benefit. She was directed back to podiatry for a new prescription. At this point, she was agreeable to another course of physical therapy to work on her anterior knee pain. She was interested in an attempt at aquatic therapy and a prescription was given for this. She will followup on p.r.n. basis." (A.R. 407).

On October 19, 2006, plaintiff appeared for her initial physical therapy evaluation and was scheduled for treatment two times a week for four-to-six weeks. (A.R. 409). Plaintiff failed to appear for her physical therapy sessions. On November 7, 2006, a physical therapist at Spectrum Health Rehabilitation noted that plaintiff had been a "no show" for all her appointments. On November 7, 2006, plaintiff was discharged as a patient. (A.R. 413).

On April 9, 2007, plaintiff returned to Dr. Kornoelje for a "recheck of her low back and right leg pain." (A.R. 417). Dr. Kornoelje wrote that although his office had previously scheduled plaintiff for physical therapy, "she did not go." (A.R. 417, 482). Plaintiff stated that she was disabled and had trouble bending and stooping, lifting kids, and bathing them. Dr. Kornoelje found that plaintiff had a decreased range of motion in her lumbar spine, but no obvious tenderness. (A.R. 419).

On April 25, 2007, Barbar Sanaullah, M.D., authorized a course of physical therapy for treatment of plaintiff's leg and back pain. (A.R. 477-80).

On August 1, 2007, plaintiff appeared at Spectrum Health complaining of headaches, dizziness, and memory loss. (A.R. 487). Plaintiff's CT scan returned normal results. (A.R. 486). Plaintiff's November 19, 2007 gallbladder ultrasound returned normal results. (A.R. 490).

On November 19, 2007, plaintiff returned to Spectrum Health Rehabilitation. She was scheduled for physical therapy two times a week for four weeks. (A.R. 492). She attended only one physical therapy session. (A.R. 495). On January 8, 2008, she was discharged as a patient for her failure to appear for scheduled appointments. (A.R. 498).

On December 27, 2007, plaintiff returned to Arbor Circle. Plaintiff participated in an initial counseling session, and the counselor summarized her behavior as follows:

> Shahidah arrived on time for her scheduled intake appointment at Arbor Circle Corporation. She presented as detached and flat. Several times during the intake she walked to the window and insisted that demons were running through the parking lot. On two occasions, she did not reply to questions posed insisting she is often unable to hear or maintain attention. Shahidah's weight is proportionate to her height. She took good care of her appearance in regard to dress, hygiene, and grooming.
>
> Shahidah reported she has heard and seen demons since being involved in a car accident in 1998. She also contends that she is afraid to sleep due to a nightly choking sensation. She

> stated, "The shadows are trying to kill[] me so I need to stay awake." Shahidah did not display problems with language, either receptively or expressively. Once engaged in conversation, Shahidah was able to explain her thoughts in a concise manner. Throughout the intake session, Shahidah focused on leg pain and hallucinations.

(A.R. 426). Plaintiff was scheduled for a three-month period of outpatient counseling sessions. (A.R. 427). Plaintiff failed to appear for any counseling sessions. (A.R. 424-25). On March 11, 2008, Arbor Circle discharged plaintiff as a patient. (A.R. 441-42).

On January 10, 2008, plaintiff complained to Dr. Sanaullah that she was experiencing chest pains and dizziness. (A.R. 499). Plaintiff's electrocardiogram returned normal results. (A.R. 500-501). On January 18, 2008, plaintiff appeared at the Spectrum Health's emergency room complaining of chest pains, racing heart sensations, and numbness and pain in her right arm. (A.R. 428). She was described as "a 27-year-old female who appears her stated age, in good health and nutrition, in no acute distress." Her upper and lower extremity strength was "+5/5." Her EKG was "unremarkable." (A.R. 428). Her chest x-ray was normal. (A.R. 437, 504). Spectrum Health physicians gave plaintiff Tylenol and Motrin prescriptions and advised her to follow-up with Dr. Sanaullah. (A.R. 428).

It was appropriate for the ALJ to take plaintiff's daily activities into account in making his credibility determination. *See Cruse v. Commissioner*, 502 F.3d 532, 542 (6th Cir. 2007); *Blacha v. Secretary of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990). The social security regulations make pellucid that the claimant bears the burden of demonstrating good reasons for her failure to follow prescribed treatment: "If you do not follow the prescribed treatment without good reason, we will not find you disabled." 20 C.F.R. § 416.930(b). The Sixth Circuit recognizes that a claimant's failure to follow prescribed treatment is evidence supporting an ALJ's factual

finding that the claimant's testimony was not fully credible. *See Sias v. Secretary of Health & Human Servs.*, 861 F.2d 475, 479-80 (6th Cir. 1988). I find that the ALJ's factual finding regarding plaintiff's credibility is supported by more than substantial evidence.

## Recommended Disposition

For the reasons set forth herein, I recommend that the Commissioner's decision be affirmed.


Dated: March 15, 2012            /s/ Joseph G. Scoville
                                 United States Magistrate Judge


## NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b). All objections and responses to objections are governed by W.D. MICH. LCIVR 72.3(b). Failure to file timely and specific objections may constitute a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Branch*, 537 F.3d 582, 587 (6th Cir.), *cert. denied*, 129 S. Ct. 752 (2008); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006). General objections do not suffice. *Spencer v. Bouchard*, 449 F.3d 721, 724-25 (6th Cir. 2006); *see Frontier*, 454 F.3d at 596-97; *McClanahan v. Comm'r of Social Security*, 474 F.3d 830, 837 (6th Cir. 2006).